UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PAMELA HOLLIST,<br><br>   Plaintiff,<br><br>   v.<br><br>MADISON COUNTY, a political<br>subdivision of the State of Idaho, and<br>ROY KLINGLER, in his individual and<br>official capacity,<br><br>   Defendant. | Case No. 4:13-cv-00139-BLW<br><br>MEMORANDUM DECISION AND<br>ORDER |

**INTRODUCTION**

  The Court has before it Defendants' Motion for Summary Judgment (Dkt. 24), as well as Plaintiff Pamela Hollist's Cross-Motion for Partial Summary Judgment (Dkt. 25). The court heard oral arguments on the motions on July 25, 2014. For the reasons expressed below, the Court will grant Defendants' motion for summary judgment as to the equal protection and freedom of association claims, and deny summary judgment as to the due process claim. The Court will deny Hollist's cross motion for partial summary judgment.

**BACKGROUND**

Plaintiff Pamela Hollist began working for Defendant Madison County in October 2007 as a detention officer in the Madison County Jail. When Hollist was hired, she and Sheriff Roy Klinger signed Hollist's Conditional Offer of Employment, which expressly established her status as an at-will introductory employee for a period of one year after the date of her hire. *Employment Offer*, Dkt. 25-7. Hollist was also provided with a copy of Madison County's Personnel Policy ("MCPP") and Madison County Sheriff's Office Policy and Procedure Manual.

In the course of her employment, Hollist met inmate Daniel Little, who was incarcerated in Madison County Jail for a felony conviction. This conviction stemmed from an incident in 2009, when Little engaged Madison County police officers in a high-speed chase following a traffic stop. The chase covered two counties and resulted in shots being fired at Mr. Little in an effort to get him to stop. *Little Dep.*, pp. 28-31. Little was eventually arrested in Fremont County and charged with felony eluding. Little was returned to Madison County and booked into jail. *Id.* at 34:5-9. Little remained at the Madison County Jail pending sentencing for approximately nine months. *Id.* at 37:1.

Following Little's conviction, he was released on probation, supervised by Madison County, in 2010. Around July 2010, Hollist hired Little to train a horse she had recently purchased. The two began dating in approximately October 2010. Hollist did not notify Sherriff Klinger or any other supervisors of her relationship with Little.

Policy 1050 of the Sheriff's Manual prohibits certain conflicting relationships. *Sheriff's Manual* at § 1052(e), Dkt. 24-8. Specifically, the Conflicting Relationships Policy prohibits an employee from knowingly commencing or maintaining a relationship "with any person who is under criminal investigation, indictment, arrest, or incarceration by this or another law enforcement agency, and/or who has an open and notorious criminal reputation in the community (for example, persons whom they know, should know, or have reason to believe are involved in felonious activity)." *Id.* The policy specifically excludes "immediate relatives" from this prohibition: "Except…*in the case of immediate relatives* …." *Id.* (emphasis added). The policy defines a "relative" as an "employee's parent, stepparent, spouse, domestic partner, significant other, child (natural, adopted or step), sibling or grandparent." *Id.* at 1050.1.1.

The policy also defines three types of relationships: Personal Relationship, Social Relationship, and Business Relationship. *Id.* A  Personal Relationship "Includes marriage, cohabitation, dating, or any other intimate relationship beyond mere friendship." *Id.* A Social Relationship "Includes communication to individuals in person, by mail, by telephone, by text messaging or by email." *Id.* And a Business Relationship is defined as "Serving as an employee, independent contractor, compensated consultant, owner, board member, shareholder, or investor in an outside business, company, partnership, corporation, venture, or obligation that is greater than $250." *Id.*

Sheriff Klinger ultimately learned of the relationship between Little and Hollist after another jailer observed Little and Hollist together. *Grover Dep.*, pp. 23:22-25; and

24:1-4. Sheriff Klinger called Hollist in for a meeting, and confronted her about the potentially-conflicting relationship. *Hollist Dep.*, p. 88:10-14. Hollist admitted to the relationship with Little and agreed that it violated policy. *Id.* at 90:3-9. Klinger believed her relationship amounted to a policy violation because of Little's probationary status. *Klinger Dep.*, p. 97:5-17.

Previously, Klinger assessed a male employee, Captain Seipert, for a similar violation. Seipert's wife was convicted of felony grand theft and misuse of public money for embezzling from Madison County and ordered to pay restitution of $62,515.75 while the two were married. *Siepert Dep.*, pp. 59-61. Klinger determined that Seipert's situation fell within the spousal exception to the policy, and he was allowed to remain employed despite his wife's conviction. *Klinger Dep.*, pp.67-68; 70-74.

On June 16, 2011, during a meeting with Klinger, Hollist received a "Notice of Proposed Personnel Action – Termination and Notice of Suspension With Pay Pending Decision." On June 17, 2011, Hollist tendered her resignation to Klinger in lieu of pursuing administrative appeal remedies for the proposed termination. She did not pursue her administrative appeal because she believed it would be futile.

Hollist submitted notice of these claims to Madison County pursuant to Idaho Code § 6-901, *et seq.* Hollist brings claims under 42 U.S.C. § 1983 and the Idaho Constitution alleging violations of her right to equal protection, freedom of association, and due process. Defendants argue that Hollist's resignation precludes her claims. They seek summary judgment on all of her claims. Hollist seeks partial summary judgment,

asking the Court to find that she had a property interest in continued employment and that her employment with Madison County was contractual.

## LEGAL STANDARD

One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

When cross-motions for summary judgment are filed, the Court must independently search the record for factual disputes. *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The filing of cross-motions for summary judgment – where both parties essentially assert that there are no material factual disputes – does not vitiate the court's responsibility to determine whether disputes as to material fact are present. *Id.*

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out

the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Deveraux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex,* 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

## ANALYSIS

### 1.    Constructive Discharge

The first question before the Court is whether Hollist's resignation constituted a constructive discharge. Unless Hollist can show constructive discharge, she cannot show an adverse employment action, which is a required element of her federal and state law claims.

To survive summary judgment on a constructive discharge claim, a plaintiff must point to triable issues of fact tending to show a reasonable person would have felt forced to resign because of intolerable and discriminatory working conditions. *Poland v.*

*Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007). An employee may also demonstrate that their decision to resign was involuntary in the absence of intolerable working conditions. *Knappenberger v. City of Phoenix*, 566 F.3d 936, 941 (9th Cir. 2009). Whether a reasonable employee in the plaintiff's position would feel she had no choice but to resign is normally a factual question for the jury. *See Wallace v. City of San Diego*, 479 F.3d 616, 626 (9th Cir. 2007).

Here, it is undisputed that Hollist submitted a letter of resignation only when faced with disciplinary action "up to and including discharge" for her violation of Madison County policy prohibiting conflicting relationships.

In support of her claim of constructive discharge, Hollist asserts that she was forced to choose between her relationship with Little and her continued employment. Although Klinger mentioned the possibility of imposing "discipline" on Hollist for her violation, he stated it was "cut and dry" that Hollist would be terminated unless she was willing to end her relationship with Little. Hollist had the option of pursuing an appeal process, but Klinger would be the official overseeing her appeal.

Taking the evidence in the light most favorable to Hollist, there is a genuine issue of fact regarding whether a reasonable person in Hollist's position would have felt compelled to resign based on the totality of the circumstances. Hollist's evidence tends to prove that if she did not terminate her relationship with Little, she would have been fired. The evidence also tends to show that Klinger had pre-determined the outcome to an appeal procedure such that an appeal would have been futile. This evidence is sufficient

to support a jury finding that Defendants gave Hollist an ultimatum (which was effectively unappealable) to either resign or be fired. Thus, a jury could reasonably conclude that Hollist was constructively discharged.

## 2. 42 U.S.C. § 1983 Claims

To state a claim against a local government entity under § 1983, a plaintiff must allege a violation of rights either protected by the Constitution or created by federal statute that is proximately caused by the conduct of a "person" acting under the color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).

Hollist brings her claims under 42 U.S.C. § 1983, the civil rights statute. She alleges that Defendants constructively discharged her in violation of her Fourteenth Amendment right to equal protection and in violation of her First Amendment right to freedom of association.

### A. *Property Interest*

To state any claim under § 1983, Hollist must establish she possessed a property interest deserving of constitutional protection. While state law establishes the parameters of an individual's substantive interest, federal law is what determines if that interest is a protected property right. *Lawson v. Umatilla Cnty.*, 139 F.3d 690, 692 (9th Cir. 1998). For continued employment to constitute a protected property interest, a person must have a reasonable expectation or a "legitimate claim of entitlement" to the benefit of continued employment. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972); *See*

*Harkness v. City of Burley*, 110 Idaho 353, 356 (1986) ("employee must have more than a mere hope of continued employment").

The long-standing rule in Idaho is that employment is presumptively "at-will" and either party may end the relationship at any time without incurring liability. *Jenkins v. Boise Cascade Corp.*, 141 Idaho 233, 240 (2005). However, the at-will presumption is rebuttable by either an express or implied limitation upon a party's right to terminate the employment relationship. *Id.* at 241. An implied limitation exists when a reasonable person could conclude from all the circumstances surrounding the relationship that both parties intended to limit the other party's right to terminate the relationship. *Id.* "Statements made and policies promulgated by the employer, whether in an employment manual or otherwise, may give rise to such an implied-in-fact agreement." *Bollinger v. Fall River Rural Elec. Co-op.*, 152 Idaho 632, 638 (2012).

Hollist first asks this Court to find that her employment was contractual. The Court must determine if, in the absence of a formalized contractual agreement, the provisions within the MCPP constitute an element of Hollist's employment agreement. Whether an employee manual constitutes an element of an employment contract is typically a question of fact for the jury, unless the manual "specifically negates any intention on the part of the employer to have it become a part of the employment contract." *Mitchell v. Zilog, Inc.*, 125 Idaho 709, 712-713 (1994). It is undisputed that the MCPP explicitly disclaims any intent to become part of the employment contract, stating at the very beginning,

THIS PERSONNEL POLICY IS NOT A CONTRACT. NO CONTRACT OF EMPLOYMENT WITH MADISON COUNTY WILL BE VALID UNLESS IT IS SIGNED IN ACCORDANCE WITH PROPER PROCEDURES BY A SPECIFICALLY AUTHORIZED REPRESENTATIVE OF THE GOVERNING BOARD <u>AND</u> UNLESS IT IS SIGNED BY AND CONTAINS THE NAME OF THE EMPLOYEE WHO WOULD BE BENEFITED BY THE CONTRACT.

*MCPP* at 6, Dkt. 25-4 (capitalization and underlining in original). Under Idaho law, this disclaimer negates any intention of Madison County that the MCPP should become part of Hollist's employment contract. The Court therefore finds that Hollist's employment with Madison County was not contractual.

However, the Court does not need to find that Hollist had a contractual employment relationship with Madison County to establish that she had a protected property right in continued employment. The Supreme Court has emphasized that a person does not need a contractual right to her job to establish a property interest in her employment – all she needs is a "legitimate claim of entitlement to the job." *See Perry v. Sindermann*, 408 U.S. 593, 601-03 (1972) (a teacher's legitimate claim of entitlement to job tenure could be defeated if he had "no contractual or *other claim* to job tenure" (emphasis added)). The disclaimer in Hollist's case provides only that the MCPP cannot be construed as an employment contract, precluding breach-of-contract claims. It does not preclude employees from enforcing constitutionally-protected property rights.

The Court then turns to whether Hollist had a legitimate claim of entitlement to continued employment based upon the combination of the MCPP provisions, the conditional offer of employment, and the conduct and oral statements of sheriff's office supervisors.

In *Lawson v. Umatilla Co.*, the Ninth Circuit held that a disclaimer stating "[u]nder no circumstances shall these policies be construed to act as any type of employment contract with any employee" precluded the district court from determining that the policy manual altered a county employee's at-will status. 139 F.3d 690, 693-94 (9th Cir. 1998). The Ninth Circuit concluded that when combined with the policy manual's disclaimer and Oregon state law establishing the at-will status of county employees, the policy manual's provisions regarding dismissal except for cause did not create a property interest as a matter of law. *Id.* The court noted that a policy manual disclaimer can retain an employee's at-will status even when the manual provides specific reasons for termination. *Id.* at 693.

Recently, this Court has had several opportunities to apply *Lawson* in cases where an employee asserts a property right in continued employment based upon employee manuals containing provisions that imply limitations on an employer's right to terminate an otherwise at-will employee.

First, in *Harms v. Jeffries*, a Power County Sheriff's deputy asserted that a policy manual's provision stating that no employee should be dismissed except for cause, combined with oral statements made by supervisors implying his employment was more than at-will, created a property interest in continued employment. No. 4:11-cv-00111-EJL-CWD, 2013 WL 791452, at *12 (D. Idaho Mar. 4, 2013). The policy manual contained disclaimer language stating, "under no circumstances is his handbook to be considered a contract." *Id.* at *5. Additionally, Harms signed a form acknowledging that

he "understood and agreed" that the manual was not an employment contract or a guarantee of any particular term of employment, that he was an "employee at-will," that the Policy Manual controlled over "verbal statements and representations," and that the list of rules contained in the manual were "illustrative and not inclusive." *Id.* at *5, *7. This Court held that the combination of (1) the contractual disclaimer, (2) the policy manual's discretionary language, and (3) the waiver form "under which Plaintiff unequivocally renounced a right to anything other than at-will employment" precluded Harms from claiming a property interest in continued employment. *Id.* at *12 n.9

Likewise, in *Sommer v. Elmore County*, a full-time employee still within her probationary employment period asserted a property right to continued employment despite her conceded at-will status. No. 1:11-cv-00291-REB, 2013 WL 5274223, at *1 (D. Idaho Sept. 18, 2013). At the time of Sommer's termination, she was still within her one-year probationary employment period and was classified as an at-will employee. *Id.* at *7. The Court held that the combination of (1) the contractual disclaimer, (2) the policy manual's discretionary language, and (3) the acknowledgement by Sommer that she was still an at-will employee precluded her from claiming a property interest in continued employment. *Id.*

By contrast, in *Brown v. Valley County*, a county employee asserted that although he did not have a contractual right to continued employment, he had a legitimate claim of entitlement to continued employment based upon the county's policy manual. No. 1:12-cv-00057-CWD at *5, 2013 WL 1453368 (D. Idaho Apr. 9, 2013). Although the policy

manual had a disclaimer and discretionary language similar to the manuals in *Lawson* and *Harms*, this Court concluded that "[n]either the contract disclaimer nor the discretionary nature of the policy manual's disciplinary rules are sufficient to negate the effect of the stand-alone provision requiring cause related to performance of job duties or other violations of the policy for termination." *Id.* at *9. The stand-alone paragraph requiring cause for termination, the absence of an express establishment of an at-will employment relationship via the policy manual, and the absence of an acknowledgement by Brown of his at-will status created "a reasonable inference" that Brown was no longer employed at-will after his 90-day introductory period. *Id.* at *7. Because this inference limited the reasons for which Brown could be discharged, this Court held that, as a matter of law, Brown had a protected property interest in continued employment. *Id.* at *10.

In Hollist's case, several provisions in the MCPP are material. The MCPP begins with a disclaimer regarding the creation of a contract of employment, as quoted above. The MCPP then confers discretionary authority upon the governing board to change policies without notice.

> CHANGES TO THE POLICIES AND BENEFIT OFFERINGS OUTLINED IN THIS HANDBOOK ARE SUBJECT TO CHANGE AT ANY TIME, WITHOUT NOTICE. CHANGES MAY BE MADE IN THE SOLE DISCRETION OF THE GOVERNING BOARD.

*MCPP* at 6, Dkt. 25-4. The MCPP also specifically distinguishes between different classifications of employees including new, part-time, casual, and full-time. The MCPP states that new employees are subject to a one-year introductory period, during which "either the employee or Madison County may end the employment relationship at will,

with or without cause or advance notice." *Id.* at 8. The MCPP establishes the significance

of the employee's classification by stating:

> The procedures for hiring, promotion, and transfer of full-time employees shall be
> subject to the provisions of this policy. Personnel actions concerning part-time or
> casual employees are not subject to guidelines set forth herein unless the handbook
> provisions expressly provi [sic] be terminated without cause at any time, and
> terminates automatically when the appointing officer leaves office.

*Id.* at 16. The MCPP also contains a stand-alone paragraph establishing a for cause

termination requirement:

> Except as otherwise provided in this paragraph, employees of **Madison County**
> will not be suspended without pay, demoted with an accompanying change in pay,
> or discharged from their positions except for cause related to performance of their
> job duties or other violations of this policy. Cause shall be determined by the
> employee's supervisor/elected official and shall be communicated in writing to the
> employee when employee status is changed.

*Id.* at 15 (bolding in original). Additionally, the MCPP specifically calls out the "at will"

status of the Senior or Chief Deputy. *Id.* at 16.

It is undisputed that Hollist was classified as a full-time, non-introductory

employee at the time of her resignation. Both Hollist and Klinger believed that, based

upon the MCPP, a supervisor could only terminate an employee for cause.

Akin to the manuals in *Lawson, Harms, Brown,* and *Sommers*, the MCPP

established a contractual disclaimer and included discretionary language by which

Madison County retained the ability to change policies at any time. However, unlike the

employee in *Harms*, Hollist did not sign an acknowledgement that the MCPP would

supersede any other verbal or written representations, or that she understood her status

would remain at-will following the introductory period. And unlike the employee in

*Sommers*, Hollist did not concede her status as an at-will employee. Hollist and Klinger both understood the MCPP to require cause before a full-time employee could be terminated after the one-year introductory period.

The facts of this case are more like those in *Brown*, in which this Court held that the manual's disclaimer and discretionary language were not enough to overcome the inference of a for-cause termination requirement. Similar to *Brown*, it was reasonable for Hollist to believe that she was no longer an at-will employee after the successful completion of her introductory period. One can reasonably infer that Madison County intended to limit their ability to terminate employees based on the following: (1) the stand-alone MCPP provision requiring "cause related to performance" of job duties before discharging an employee; (2) the MCPP provisions specifically identifying at-will employees as casual and part-time employees, full-time first-year employees, and appointed deputies; and (3) the absence of provisions establishing any other employees as "at-will."

In addition to the MCPP, Hollist also relies upon oral representations and the general practices of the Sherriff's Office that employees could only be terminated for cause. She also relies upon her executed conditional offer of employment, which established that during the first year introductory period she could be terminated "without cause." *Employment Offer*, Dkt. 25-7. This document establishes a reasonable inference that after the expiration of the probationary period, Hollist could no longer be terminated without cause.

The Court finds that, as a matter of law, a reasonable person would conclude that Hollist had a reasonable expectation in continued employment after the expiration of her probationary period.

**B.** ***State Actors - Sheriff Klinger & Madison County as Defendants***

Having decided that Hollist had a property interest in continued employment, the Court must next determine if Sheriff Klinger was a "person" under color of state law. Public employees act under color of state law when they act in their official capacity. *West v. Atkins*, 487 U.S. 42, 50 (1988). In a § 1983 claim, an individual agent can be liable either personally or in his official capacity. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). To be personally liable, the individual agent must have directly caused the deprivation of a federal right while acting under color of state law. *Id.* at 166. If an individual agent is liable in his official capacity, liability is imputed to the governmental entity. *Id.* Therefore, when bringing a claim against an agent acting in his official capacity, the plaintiff must show a policy or practice was a "moving force" in the constitutional deprivation. *Id.*

Here, the deprivation of Hollist's property interest in continued employment was directly caused by Klinger's enforcement of Policy 1050 of the Sheriff's Manual. Because Klinger was acting as Sheriff of the Madison County Sheriff's Office, the Court finds that Klinger was a person acting under color of state law.

In a § 1983 claim, a municipality can be liable when a constitutional deprivation was directly caused by a municipal policy, statement, ordinance, regulation, decision, or

custom officially adopted and promulgated by that body's officers. *Monell v. Dept. of Soc. Services of City of New York*, 436 U.S. 658, 690-91 (1978). The 1050 Policy against conflicting relationships was an official policy of the Madison County Sheriff's Office adopted by Madison County and enforced by its agents including Sheriff Klinger, the final policy maker for the Sheriff's Office. *Def.'s Statement of Facts* at ¶ 3, Dkt. 24-2. The enforcement of this policy directly caused the potential constitutional deprivation of Hollist. Therefore, liability is imputed to Madison County from Klinger's actions while in his official capacity.

### C. *Qualified Immunity of Klinger*

The doctrine of qualified immunity protects state actors from liability if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It establishes immunity from suit rather than a defense to liability. *Id.*

Resolving qualified immunity claims involve two steps. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). First, a court must decide if the alleged facts make out a violation of a constitutional right. *Id.* at 201. If this step is satisfied the court must then decide whether the right at issue was "clearly established" at the time of the defendant's misconduct. *Id.* Therefore, the Court must first determine if Hollist's constitutional claims are supported by the evidence.

*(1) Equal Protection Claim*

The Equal Protection Clause of the Fourteenth Amendment confers a "federal constitutional right to be free from gender discrimination" at the hands of government actors. *Davis v. Passman*, 442 U.S. 228, 234-35 (1979). To survive summary judgment on an equal protection claim, a plaintiff must produce evidence that would allow a reasonable trier of fact to conclude by a preponderance of the evidence that the questionable act was gender motivated. *Keyser v. Sacramento City Unified School Dist.*, 265 F.3d 741, 754 (9th Cir. 2001).

To prove gender discrimination under 42 U.S.C. § 1983, Hollist may base her case either on direct evidence of discriminatory intent or on a presumption of discriminatory intent arising from the factors set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Id.* The factors are: (1) membership in a protected class; (2) qualifications for the job or satisfactory performance of the job; (3) an adverse employment decision; and (4) treatment different from those similarly situated outside the protected class. *Id.* Very little evidence is required to raise a genuine issue of fact regarding a defendant's motive that will require resolution by a fact finder. *Nicholson v. Hyannis Air Service, Inc.*, 580 F.3d 1116, 1127 (9th Cir. 2009).

Once a plaintiff establishes a prima facie case under *McDonnell Douglas*, a defendant may overcome the presumption of discrimination by stating a legitimate, non-discriminatory reason for its actions. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-

07 (1993). If a defendant produces admissible evidence of a legitimate reason, the presumption of discrimination "drops out of the picture." *Id.* at 511.

To survive summary judgment, the plaintiff must then produce direct or circumstantial evidence to show the defendant's reason was pretextual or unworthy of credence. *Anthoine v. N. Cent. Counties Consortium*, 605 F.3d 740, 753 (9th Cir. 2010). Circumstantial evidence must be "specific" and "substantial" to create a triable issue as to the employer's intent to discriminate. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1029 (9th Cir. 2005). A plaintiff may counter a defendant's proof of legitimate business reasons by showing that the rules were not uniformly enforced, which raises an inference of selective enforcement against the plaintiff as a pretext to discrimination. *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir 1996). However, a plaintiff fails to raise a triable issue of fact when she does not provide evidence beyond that required to show a prima facie case of discrimination. *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994).

Here, Hollist has established a prima facie gender discrimination claim under *McDonnell Douglas*. She can prove the first two elements, and can establish the third element of an adverse employment decision if the jury finds that her resignation constituted a constructive discharge. With regard to the fourth element, the court accepts that Hollist and Captain Seipert were similarly situated for purposes of the conflicting relationship policy. As employees of the Sheriff's Office, both were required to comply with the provisions of the policy and both were in relationships that Klinger evaluated as

potential policy violations. Klinger concluded that Captain Seipert, a man, did not violate the policy, but that Hollist, a woman, did violate the policy.

To overcome the presumption of discrimination, Madison County offers a legitimate, non-discriminatory reason for terminating Hollist: her violation of company policy. Klinger, at the time he evaluated the potential violation, distinguished Hollist's situation from that of Captain Seipert. Seipert was already married to his wife prior to her embezzlement, therefore falling within a clear exception to the policy; he did not meet her through his employment with Madison County Jail; and he did not keep the relationship a secret from administrators. By contrast, Hollist commenced her relationship with Little while he was on felony probation under the supervision of Madison County; she did not inform administrators of her relationship; and she agreed with Klinger that the relationship violated the policy provision.

This last fact is important. In hindsight, it could easily be said that Hollist did not violate the conflicting relationship policy by commencing a relationship with Little: at the time Hollist asked Little to help with her horses, he was not under criminal investigation, indictment, arrest, or incarceration by this or another law enforcement agency, and it is questionable whether his probationary status meant he had an open and notorious criminal reputation in the community. But Hollist agreed she violated the policy and she tendered her resignation before Madison County could further investigate the alleged violation.  Thus, Klinger's subjective belief that Hollist violated the policy was reasonable given the evidence available to him at the time. This proffered explanation is

therefore legitimate and non-discriminatory, and it successfully rebuts the presumption of discrimination.

Other than the fact Captain Seipert is a man and Hollist is a woman, there is no evidence to suggest that Madison County or Klinger acted with discriminatory intent in providing Hollist with the "Notice of Proposed Personnel Action – Termination and Notice of Suspension With Pay Pending Decision." To the contrary, all the evidence submitted by the parties suggests that Klinger honestly and reasonably believed that Hollist had violated the Conflicting Relationships policy while believing that Seipert had not. As discussed above, Captain Seipert and Hollist's situations were sufficiently distinct to explain Madison County's differential treatment of the two employees: Captain Seipert's relationship with his wife clearly fell within an exception to the Conflicting Relationships policy, and Hollist's relationship with Little did not fall within that exception. Because Hollist has shown no evidence beyond that which she alleged to support her prima facie case of discrimination, her gender discrimination equal protection claim must fail.

Due to the insufficient evidence to support gender discrimination, it appears as though Hollist's claim is more appropriately premised upon arbitrary treatment between two similarly situated individuals rather than upon gender. However, this "class of one" equal protection theory is not appropriate for the public employment context. *Engquist v. Or. Dep't of Agriculture*, 553 U.S. 591, 607 (2008). "The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made

daily by public agencies." *Id.* at 609 (quoting *Connick v. Myers*, 461 U.S. 138, 154 (1983).

Here, Hollist's claim rests upon an allegation of differential treatment based upon a subjective personnel decision. Klinger's seemingly arbitrary enforcement of the conflicting relationship policy also fails to support Hollist's equal protection claim. The Court will grant Defendants' motion for summary judgment on Hollist's equal protection claim.

*(2) Freedom of Association Claim*

Constitutionally protected freedom of association includes both the "freedom of intimate association" and the "freedom of expressive association." *Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984). An individual's decision to enter into and maintain an intimate relationship constitutes a "fundamental element of personal liberty." *Id.* This privacy right is protected by the Due Process Clause of the Fourteenth Amendment. *IDK, Inc. v. Clark Cnty.*, 836 F.2d 1185, 1192 (9th Cir. 1988). It protects those "highly personal relationships" that presuppose "deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of beliefs but also distinctly personal aspects of one's life." *Roberts*, 468 U.S. at 619-20.

To determine whether a governmental rule unconstitutionally infringes on an associational freedom, courts balance the strength of the associational interest against the state's justification for the interference. *Chi Iota Colony of Alpha Epsilon Pi Fraternity v.*

*City Univ. of New York*, 502 F.3d 136, 143 (2nd Cir. 2007). A policy interfering with core associational liberties cannot be upheld without sufficient important state interests and close tailoring to effectuate those interests. *Zablocki v. Redhail*, 434 U.S. 374, 388 (1978). But, where an associational interest is of less importance and the challenged regulation only minimally interferes with the associational freedom, the state's justification need not be as substantial. *See Id.* at 386. A state's authority over an individual's freedom to enter into a particular association depends upon where the relationship falls on a spectrum "from the most intimate to the most attenuated of personal attachments." *Roberts*, 468 U.S. at 619.

Here, the Court must determine where Hollist's relationship with Little falls on the relationship spectrum to determine what level of scrutiny to apply to the association Hollist seeks to protect. Thus far, the Supreme Court has only extended the right of privacy to unmarried individuals in cases involving contraception and abortion. *Fugate v. Phoenix Civil Serv. Bd.*, 791 F.2d 736, 739-740 (9th Cir. 1986). Because a dating relationship between adults does not fall under one of the bright-line categories established by the Supreme Court as "most intimate," strict scrutiny is not an appropriate measure of review. *See Roberts*, 468 U.S. at 619.

Hollist's asserted associational right is a dating relationship. A dating relationship, by its very nature, can fall on a wide spectrum from intimate to casual. Hollist alleges that her relationship with Little was most consistent with a spousal familial relationship. The Court is unwilling to conclude generally that dating adults living separately demonstrate

an objective level of commitment equivalent to a familial relationship. However, based upon the specific facts Hollist alleges (that they love each other and her children refer to him as "Dad"), the Court is willing to accord Hollist's claimed associational right substantial weight. The standard of review in this case should be one of intermediate scrutiny. To pass intermediate scrutiny a government's stated objective must be substantial, and there must be a reasonable fit between the challenged regulation and the government's objective. *U.S. v. Chovan*, 735 F.3d 1127, 1139 (9th Cir. 2013).

A regulation based upon the municipality's "method of organizing its police force" is presumptively valid. *Fugate*, 791 F.2d at 741. Further, the Supreme Court has previously acknowledged that courts should afford significant deference to prison administrators regarding policies and practices required to preserve internal order and prison security. *Bell v. Wolfish*, 441 U.S. 520, 548 (1979). Policy 1050 is expressly intended to "ensure effective supervision, safety, performance, assignments, and discipline while maintaining positive morale by avoiding actual or perceived favoritism, discrimination, or other actual or potential conflicts of interest by or between members of this office and members of the public." *Policy 1050* at 7, Dkt. 24-8. Madison County has legitimate interests in maintaining the security, safety, and public perception of the Sheriff's Office, and in minimizing conflicts of interest. To protect these legitimate interests, the County must establish regulations governing the conduct of law enforcement personnel. The prohibition of relationships between employees and the types of persons set forth in Policy 1050 reasonably advances these interests. Because the

County's interest in the safe and orderly administration of its prison system is substantial, and there is a reasonable fit between the County's interest and the conflicting relationship policy, the Court finds that this policy survives intermediate scrutiny. Therefore, the Court will grant Defendants' motion for summary judgment on Hollist's freedom of association claim.

### (3) Due Process Claim

Although Hollist did not allege a specific due process claim in her original complaint, both parties have thoroughly addressed the issue in their briefing. The question before the Court is whether Hollist's potential involuntary resignation in lieu of participating in an appeal hearing offered by Madison County violated her right to due process.

The Due Process Clause of the Fourteenth Amendment applies to public employees who have a property right in continued employment. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985). Due process requires that a person be given notice of her impending termination and a pretermination hearing. *Id.* at 542. "It is well-settled that the Due Process Clause requires … 'a fair trial in a fair tribunal.'" *Stivers v. Pierce*, 71 F.3d 732, 741 (9th Cir. 1995). However, an impartial decision maker at a pre-termination hearing does not necessarily violate due process as long as the decision maker at a post-termination hearing is impartial. *Walker v. City of Berkeley*, 951 F.2d 182, 184 (9th Cir. 1991).

Because Madison County does not offer post-termination hearings, the burden was on Madison County to conduct Hollist's pretermination hearing in a way that would afford her sufficient due process, which necessarily included providing a non-biased decision maker. To show unconstitutional bias, a plaintiff must overcome a presumption of honesty and integrity in those serving as adjudicators. *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). The plaintiff must show the decision maker "has prejudged, or reasonably appears to have prejudged, an issue." *Stivers*, 71 F.3d at 741 (citing *Kenneally v. Lungren*, 967 F.2d 329, 333 (9th Cir. 1992)).

At Hollist's meeting with Klinger on June 16, he gave her the notice of the proposed personnel action for her alleged violation of the conflicting relationship policy. The notice expressly stated that Hollist could respond to the allegations in writing or request a pretermination hearing. The notice also stated that Klinger would serve as the decision maker to her appeal. During the meeting, Klinger made it clear to Hollist that he believed she had violated the policy. He also articulated that he could not waiver from enforcement of the policy and his determination to terminate her was "cut and dry" unless she was willing to terminate the relationship. From the facts in the record, the Court finds that a jury could reasonably conclude that Klinger prejudged the outcome of any potential appeal by Hollist on the issue of her relationship with Little.

With a biased decision maker presiding over her appeal, Hollist believed that an appeal would have been futile. Instead of appealing Klinger's decision, Hollist formally tendered her resignation on June 17. An individual is not required to pursue an appeal

procedure that would be inadequate due to existing bias. *See Bignall v. N. Idaho Coll.*, 538 F.2d 243, 247 (9th Cir. 1976). Because a jury could conclude that Klinger was a biased decision maker, Hollist could not waive due process protections by failing to pursue an appeal.

Hollist has raised a triable issue of fact as to whether her due process rights were violated, and therefore the Court will deny summary judgment on Hollist's due process claim with respect to Madison County.[1]

The question remains, however, whether Sheriff Klinger is entitled to qualified immunity on this potential violation, which hinges on whether Hollist's right to procedural due process was "clearly established" at the time. The protection offered to government officials is far-reaching. *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 977 (9th Cir. 1998). "[I]f officers of reasonable competence could disagree on the issue [whether a chosen course of action is constitutional], immunity should be recognized." *Id.* (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). This immunity applies where a government official reasonably, but erroneously, believes that

---

[1] In general, local governmental entities are immune from direct claims under § 1983 unless the Plaintiff can show that the alleged constitutional violation arises from an official policy or regulation adopted by the entity. See, *Monell v.Department of Social Services of the City of New York,* 436 U.S. 658, 690, (1978) ("[l]ocal governing bodies ... can be sued directly under § 1983"where the unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."). While Madison County argued that none of Hollist's claims were the result of an implementation of the official policy or regulations of Madison County, it seems clear that the hearing procedures adopted by the Sheriff's office constituted an official policy or regulation adopted by the County or its officers.

his conduct does not violate the plaintiff's rights. *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) (en banc).

Hollist's right to an impartial decision maker was clearly established. And, Klinger could not have reasonably believed that his conduct did not violate Hollist's rights. While Hollist admitted – perhaps mistakenly – that her conduct violated the policy, this admission would not change her entitlement to a hearing before an impartial decision maker. At most, it suggested that she might admit the allegations and not pursue an appeal. It did not create a reasonable mistake on Klinger's part as to the contours of Hollist's right to a hearing which afforded her due process of law. Therefore, the Court finds that Klinger is not entitled to qualified immunity on Hollist's due process claim.

**3.    State Law Claims**

Idaho courts generally use the federal framework for analyzing state constitutional questions. *CDA Dairy Queen, Inc. v. State Ins. Fund*, 154 Idaho 379, 383 (2013). However, if Idaho precedent or the Idaho Constitution provides greater protection than the federal constitution, courts will not "blindly apply" federal interpretation and methodology. *Id.*

**A.  *Equal Protection***

A majority of Idaho cases state that the equal protection guarantee of the Idaho Constitution is substantially equivalent to that of the federal Constitution. *Rudeen v. Cenarrusa*, 136 Idaho 560, 568 (2001). An equal protection claim under both constitutions involve the same three-step process set forth in *Tarbox v. Idaho Tax*

*Commission*, 107 Idaho 957, 959 (1984). Because Hollist's equal protection claim under the federal Constitution ultimately fails, her state law claim under the same analytical framework must also fail.

**B.** *Freedom of Association*

The Idaho Supreme Court analyzes potential infringements upon a public employee's right to associate by using the balancing test set forth in *Connick v. Myers*, 461 U.S. 138 (1983). *See Gardner v. Evans*, 110 Idaho 925, 933-35 (1986). Because this balancing test is the same one used to analyze Hollist's unsuccessful federal Constitutional claim, her Idaho Constitutional claim also fails.

**C.** *Procedural Due Process*

Idaho applies federal standards to due process claims brought under the Idaho Constitution. *Jones v. State Bd. of Med.*, 97 Idaho 859, 868-69 (1976). For the reasons stated above under the federal constitutional analysis, the Court will deny Defendant's Motion for Summary Judgment as to Hollist's due process claim.

# ORDER

**IT IS ORDERED:**

1.      Plaintiff's Motion for Partial Summary Judgment (Dkt. 25) is **DENIED**.

2.      Defendants' Motion for Summary Judgment (Dkt. 24) is **GRANTED** as to the equal protection and freedom of association claims; and **DENIED** as to the due process claim.

DATED: October 9, 2014

B. Lynn Winmill
Chief Judge
United States District Court